**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

TECHFIELDS PHARMA CO., LTD.,

    Plaintiff,

      v.

COVANCE, INC., et al.,

    Defendants.

---

Civil Action No. 16-1148 (RK) (JBD)

**OPINION FILED UNDER**
**TEMPORARY SEAL**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon Motions for Summary Judgment filed by Defendants Covance, Inc.[1] ("Covance") and Fisher Clinical Services, Inc. ("Fisher" or "FCS") (collectively, "Defendants"). (ECF Nos. 212 ("Cov. MSJ"), 221 ("FCS MSJ").) On March 6, 2024, the Court ruled on Defendants' motions as to Defendants' liability but determined that resolving Defendants' damages arguments at that time would have been premature. Accordingly, the Court reserved ruling on Defendants' motions as to the damages claims brought by Plaintiff Techfields Pharma Co., Ltd., ("Techfields"). (ECF Nos. 311, 312.) As discussed with the parties at a telephone conference held on March 19, 2024, the Court now addresses Defendants' damages arguments. The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions regarding Techfields' damages claims are **GRANTED** in part and **DENIED** in part.

---

[1] In June 2021, Covance was renamed Labcorp Drug Development. (ECF No. 213-1 ("Cov. SOF") ¶ 10.) The parties refer to Defendant as Covance. For ease of reference, the Court does the same.

I.    **BACKGROUND**[2]

X0002 is a topical nonsteroidal anti-inflammatory drug ("NSAID") developed by Techfields.[3] (Tech. SOF ¶ 1.) It is a high penetration prodrug[4] that is applied via topical spray and penetrates the skin before converting into ibuprofen in the body's plasma and other tissues. (*Id.* ¶ 2.) X0002 was developed to treat the pain associated with osteoarthritis. (*Id.* ¶ 3.) It is the first drug product developed by Techfields, which has never secured regulatory marketing approval from the FDA or any other regulatory body to sell any of its products, including X0002. (Cov. SOF ¶¶ 7–8.) This litigation arises from the phase II clinical trial for X0002.

Techfields retained Frontage Laboratories, Inc. ("Frontage US"), a non-party to this litigation, to manage X0002's phase I clinical trial. (*Id.* ¶ 8.) For the phase II clinical trial (the "Clinical Trial" or "Study"), Techfields retained Frontage US's Chinese branch ("Frontage China") to manufacture, bottle, label, and package the clinical trial supplies ("CTS"). (Tech. SOF ¶ 13; Cov. SOF ¶ 55.) Techfields also retained Covance—a global contract research organization ("CRO") that develops and manages clinical trials—to manage the Clinical Trial. (Tech. SOF ¶¶ 4, 8.) Finally, Covance retained Fisher to unpack, assemble, label, package, manage, and distribute individual clinical trial kits and their components to Clinical Trial sites across the United States.

---

[2] The background of this case is well-known to the parties and to the Court, as the Court previously described Techfields' allegations in-depth in its summary judgment Opinion as to Defendants' liability. (*See* ECF No. 311 ("MSJ Opinion") at 3–26.) The Court therefore will only recount the details necessary to resolve Defendants' damages arguments.

[3] The facts in this Opinion are undisputed unless otherwise noted, and are taken from Covance's Statement of Material Facts, (Cov. SOF), Techfields' Response to Covance's Statement of Material Facts (ECF No. 247-2 ("Tech. Resp. to Cov. SOF")), Fisher's Statement of Material Facts, (ECF No. 225 ("FCS SOF"), Techfields' Response to Fisher's Statement of Material Facts, (ECF No. 247-1 ("Tech. Resp. to FCS SOF")), Techfields' Statement of Material Facts, (ECF No. 247 ("Tech. SOF")), Covance's Response to Techfields' Statement of Material Facts, (ECF No. 270 ("Cov. Resp. to Tech. SOF")), and Fisher's Response to Techfields' Statement of Material Facts, (ECF No. 263 ("FCS Resp. to Tech SOF")).

[4] A prodrug is an inactive compound that metabolizes in the body into an active drug—in this case, ibuprofen. (Tech. SOF ¶ 1.)

(*Id.* ¶ 12.) The Clinical Trial utilized a "multicenter, randomized, double-blind (within dose), placebo-controlled, parallel-group, dose-range-finding study"—meaning that some study participants received X0002 (the "Active Drug") while others received placebo, and neither the subjects nor the investigators knew which participants received Active Drug and which received placebo. (*Id.* ¶ 12; Cov. SOF ¶ 57.)  Ultimately, Plaintiff accused Covance and Fisher of botching the Clinical Trial by mixing up and mislabeling Active Drug and placebo and covering up their mistakes.

On February 29, 2016, Techfields filed this action, bringing three claims: breach of contract, fraud, and breach of the covenant of good faith and fair dealing. (ECF No. 1.) On April 26, 2016, Covance moved to dismiss Techfields' Complaint, and Fisher moved to dismiss Techfields' fraud and good faith and fair dealing claims. (ECF Nos. 15, 21.) On August 9, 2017, the Honorable Michael A. Shipp, U.S.D.J., dismissed Techfields' fraud and good faith and fair dealing claims without prejudice. (ECF No. 62.) On August 25, 2017, Techfields filed an Amended Complaint. (ECF No. 67.) On October 2, 2017, both Covance and Fisher moved to dismiss Techfields' fraud and good faith and fair dealings claims. (ECF Nos. 70, 77.) On April 30, 2018, Judge Shipp denied Defendants' motions to dismiss. (ECF No. 115.) Thereafter, the parties proceeded to discovery.

On May 15, 2023, this case was reassigned to this Court. (ECF No. 310.) At that time, there were four pending motions filed by Defendants which had recently been reactivated following unsuccessful attempts at settlement: (1) Covance's *Daubert* Motion; (2) Fisher's *Daubert* Motion; (3) Covance's Motion for Summary Judgment; and (4) Fisher's Motion for Summary Judgment. Defendants' *Daubert* Motions seek to exclude the testimony and opinions of Techfields' damages expert, Jeffery B. Baresciano ("Mr. Baresciano"), upon whom Techfields relies to calculate lost

profits and certain other consequential damages. Both Defendants also filed Motions for Summary Judgment. Covance moved for partial summary judgment on Techfields' fraud and good faith and fair dealing claims. Fisher, for its part, moved for summary judgment on each of Techfields' claims. Both Defendants also moved for summary judgment on Techfields' damages claims. The crux of Defendants' damages arguments is that Techfields is not entitled to any lost profits, punitive damages, or any other indirect, consequential, or special damages.

On March 6, 2024, the Court ruled on Defendants' Motions for Summary Judgment regarding Defendants' liability. First, the Court denied Fisher's motion as to Techfields' breach of contract claim. The Court determined that there was a genuine dispute of material fact as to whether the Techfields and Fisher mutually manifested an intent to be bound by the Clinical Trial Supplies Plan ("CTSP") and as to whether Fisher breached the Master Clinical Services Agreement ("MCSA") by mixing up and mislabeling some of the Clinical Trial Supplies ("CTS"). (MSJ Opinion at 28–35.)

Second, the Court granted Defendants' motions as to Techfields' fraud claim, determining that Techfields could not demonstrate that it reasonably relied on the allegedly flawed Clinical Trial results because, immediately upon receipt of the Clinical Trial data, Techfields was adamant that the results were inaccurate and never accepted Defendants' representations as to the accuracy of the data. (*Id.* at 35–44.)

Third, the Court denied Defendants' motions as to Techfields' claim for breach of the implied covenant of good faith and fair dealing. The Court determined that, although it was a close call, there was colorably enough evidence in the record to support Techfields' theory that the CTS was comingled and that such commingling was not reflected in the audits conducted after the conclusion of the Clinical Trial because Defendants covered their tracks. (*Id.* at 44–50.) Because

the Court was required to draw all reasonable inferences and doubts in favor of Techfields, the Court determined that Techfields had presented enough evidence to survive summary judgment on its good faith and fair dealing claim.

First, the Court pointed out the undisputed evidence that (1) there were serious issues with the CTS when it arrived at the Fisher facility from Frontage China, forcing Fisher to manually sort thousands of containers of CTS to segregate Active Drug and placebo kits and (2) the Clinical Trial data itself reflects that Study participants who were assigned to receive placebo had detectable amounts of the Active Drug or ibuprofen (the Active Drug's metabolite) in their plasma. (*Id.* at 31–32.) With respect to Covance, the Court also noted that Covance circulated internal emails expressing concerns about its own performance during the Clinical Trial and about the operating procedures at Fisher's facility and that there is no evidence these concerns were relayed to Techfields. (*Id.* at 46–47.) With respect to Fisher, the Court noted that, while Fisher conducted a self-audit to investigate evidence that the CTS had been commingled and mislabeled, the Fisher employee who wrote the audit report, Tyler Kovitch ("Mr. Kovitch"), expressed concerns internally that his report was not accurate; however, Fisher never updated its audit or conducted additional investigations nor does the record reflect that this information was relayed to Techfields. (*Id.* at 49–50.) With respect to both Defendants, a report prepared by Techfields' expert, Kang Wang ("Mr. Wang"), showed that the decomposition of the solutions used in the CTS bottles was highly anomalous, which suggested that someone had tampered with the CTS. (*Id.* at 48.) Finally, the Court reserved ruling on Defendants' motions as to Techfields' damages claims.

The Court now turns to the unresolved issues in this case. As noted above, there are two pending *Daubert* Motions seeking to exclude Mr. Baresciano's expert testimony regarding, *inter alia*, the amount of lost profits that Techfields suffered as a result of Defendants' alleged conduct.

The Court finds that the relevance of Mr. Baresciano's testimony hinges on whether Techfields' damages must be limited as a matter of law by the limitation of liability provisions contained in the parties' contracts. If Techfields is not entitled to any indirect, consequential, or special damages, Defendants' *Daubert* Motions are moot. Accordingly, the Court begins with Defendants' arguments in their Motions for Summary Judgment.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. Once the movant meets its threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). But a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts."). The non-moving party must point to "concrete evidence in the record"—mere allegations, conclusions, conjecture, and speculation will

not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg, 594 F.3d 210, 227* (3d Cir. 2010) ("[S]peculation and conjecture may not defeat summary judgment." (citation omitted)). Such evidence must be admissible at trial although it need not be in admissible form at the time of summary judgment. *FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In such cases, summary judgment is still appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## III.   DISCUSSION

Both Defendants move for summary judgment on Techfields' damages claims. First, they argue that Techfields is barred from seeking any damages in excess of the limitation of liability provisions contained in the parties' contracts. Second, Defendants argue that Techfields' demand for lost profits is incurably speculative and in violation of New Jersey's New Business Rule ("NBR"). Finally, Fisher separately argues that the imposition of punitive damages is not appropriate in this case. The Court begins with Defendants' arguments regarding the enforceability of the limitation of liability provisions.

### a.   LIMITATION OF LIABILITY PROVISIONS

As the Court explained in its first summary judgment Opinion, Techfields and Covance executed a Clinical Services Agreement ("CSA") on January 24, 2014. (Tech. SOF ¶ 10; Cov. SOF ¶¶ 17, 20.) The CSA contains a limitation of liability provision, which states:

> Limitation of Liability: In the event of a breach or default by Covance under this Agreement, Covance agrees, at its option to

> either repeat the Services at issue or refund the portion of
> consideration attributable thereto. In no event shall the liability of
> Covance for a breach or default under this Agreement exceed the
> amount of fees paid by Techfields to Covance under this Agreement.
> Under no circumstances shall Techfields be entitled to, nor shall
> Covance be responsible for, any incidental, indirect, consequential,
> punitive, exemplary or special damages (including, without
> limitation, loss of sales, revenue or profits) arising in connection
> with such default or breach of Covance's obligations under this
> Agreement, the protocol or any documents related thereto.

(Cov. SOF ¶ 32; Cov. MSJ Ex. 18 at 9.)[5]

Covance and Fisher executed a Master Clinical Services Agreement ("MCSA") as well as

related Task Orders executed pursuant to the MCSA. (Tech. SOF ¶ 15; Cov. SOF ¶ 13; FCS SOF

¶ 18.)[6] The MCSA also contains limitation of liability provisions, which state:

> [U]nder no circumstances shall a party be liable to the other party in an amount
> that, in the aggregate, exceeds the total of all fees paid to Fisher by Covance for the
> project.

> Except with respect to a party's indemnification obligations for third party claims
> by a third party other than sponsor [Techfields], in no event shall either party be
> liable to the other party for any consequential, incidental, indirect[,] punitive,
> exemplary, or special damages (including, without limitation, loss of sales, revenue
> or profits) suffered by the other party or its affiliates regardless of legal theory, even
> if the other party has been notified about the possibility of such damages.

(FCS MSJ, Ex. 10 at *9.)[7]

---

[5] Covance points out that Techfields and Covance executed a Letter of Intent on August 20, 2013, which
also contained the following limitation of liability provision:

> In no event shall the liability of Covance for any breach or default
> hereunder exceed the amount of fees it has been paid pursuant hereto.
> Under no circumstances shall Techfields be entitled to, nor shall Covance
> be responsible for, any incidental, indirect, consequential or special
> damages, including loss of profit, arising in connection with any default
> or breach of Covance's obligations under this Letter, the protocol or any
> documents related thereto.

(Cov. MSJ at 35–36, Ex. 15 at *4.)

[6] The parties agree that Techfields was an intended third-party beneficiary of the MCSA and is therefore
bound by same. (*See* FCS SOF ¶ 19; Tech. Resp. to FCS SOF ¶ 19.)

[7] Likewise, Fisher points out that Techfields and Fisher also executed a Letter of Indemnification on
October 15, 2013, in which Techfields "agree[d] and acknowledge[d] that under no circumstances shall

Based on the above provisions, Defendants contend that Techfields' damages must be capped at the parties' contract fees: Techfields' recovery from Covance may not exceed the amount in fees that Techfields paid to Covance, and Techfields' recovery from Fisher may not exceed the amount in fees that Covance paid to Fisher. The Court notes at the outset that Techfields agrees that the limitation of liability provisions limit its damages with respect to its breach of contract claims. (Tech. Opp. to FCS MSJ at 23–24.) However, the parties dispute whether the provisions should also limit Techfields' damages flowing from its good faith and fair dealing claims.

The Court begins with the settled principle that New Jersey courts generally do not interfere with the freedom of parties to contract as they please. *Saxon Const. & Mgmt. Corp. v. Masterclean of North Carolina, Inc.*, 641 A.2d 1056, 1058 (N.J. Super. Ct. App. Div. 1994) (collecting cases); *Stelluti v. Casapenn Enterprises, LLC*, 1 A.3d 678, 688 (N.J. 2010) ("As a general and long-standing matter, contracting parties are afforded the liberty to bind themselves as they see fit."). Accordingly, commercial contracts are ordinarily upheld. *Asch Webhosting, Inc. v. Adelphia Bus. Sols. Inv., LLC*, 362 F. App'x 310, 312 (3d Cir. 2010) ("The judiciary will not undertake the writing of a different or better contract between the parties."); *see also Stelluti*, 1 A.3d at 688 ("[C]ourts are hesitant to interfere with purely private agreements."). Against this backdrop, limitation of liability provisions in private contracts are enforceable so long as they do not violate public policy. *Prof'l Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 167 (3d Cir. 2007) (citing *Mayfair Fabrics v. Henley*, 226 A.2d 602, 605 (N.J. 1967)).

Generally, a limitation of liability provision does not violate public policy if the following four factors (sometimes referred to as the *Gershon* factors) are present: "1) [the provision] does

---

[FCS] be liable for loss or damage to any such items, even if due to [FCS's] negligent actions or inactions, in an amount in excess of the lesser of: (i) $100,000; or (ii) the aggregate fees paid to FCS for the specific Project regarding which any such damaged or lost items were provide FCS." (FCS MSJ at 39–40, Ex. 14 at *2.) According to Fisher, the letter further evidences Techfields' intent to limit its entitlement to damages.

not adversely affect the public interest; 2) the exculpated party is not under a legal duty to perform; 3) [the provision] does not involve a public utility or common carrier; [and] 4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable." *Gershon v. Regency Diving Ctr., Inc.*, 845 A.2d 720, 727 (N.J. Super. Ct. App. Div. 2004); *see also Asch Webhosting, Inc.*, 362 F. App'x at 312 (quoting *Gershon*, 845 A.2d at 727); *Stelluti*, 1 A.3d at 688 (quoting *Gershon*, 845 A.2d at 727). "The standard for unconscionability is [a] 'lack of honesty in fact, good faith, and fair dealing.'" *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 314 (D.N.J. 2020) (quoting *Doe v. Bank of Am., N.A.*, 16-3075, 2018 WL 295565, at *8 (D.N.J. Jan. 3, 2018)). Courts also consider the "adhesive nature" and "subject matter of the contract" as well as "the degree of economic compulsion motivating the adhering party." *Doe*, 2018 WL 295565, at *8 (quoting *Lucier v. Williams*, 841 A.2d 907, 911 (N.J. Super. Ct. App. Div. 2004)).

A limitation of liability provision that expressly disclaims liability for negligence may disclaim liability for "gross negligence." *Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc.*, 497 A.2d 530, 533–34 (N.J. Super Ct. App. Div. 1985). However, a limitation of liability provision cannot be used to shield a party from liability for "willful and wanton misconduct." *Id.*[8] The Supreme Court of New Jersey has defined willful and wanton misconduct as follows: "[i]t must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will probably or likely result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result." *McLaughlin v. Rova Farms, Inc.*, 266

---

[8] Courts have explained that this is because gross negligence differs from negligence only in *degree*, while willful and wanton misconduct is different in *kind*. *Tessler*, 497 A.2d at 533; *see also St. Paul Fire & Marine Ins. Co. v. Wells Fargo Alarm Servs.*, No. 95-712, 1995 WL 306642, at *4 (D.N.J. May 9, 1995) (adopting the approach from *Tessler*).

A.2d 284, 305 (N.J. 1970); *see also Travelers Indem. Co. v. S.C.S. Realty Corp.*, 151 F. App'x 180, 181 (3d Cir. 2005) (quoting *McLaughlin*, 266 A.2d at 305).

Covance contends that the limitation of liability provision in the CSA is "written in plain and clear language, is the product of lengthy negotiations between sophisticated parties, and does not run contrary to the public interest." (Cov. MSJ at 35.) Likewise, Fisher argues that the MCSA, especially coupled with the parties' Letter of Indemnification, evidences an agreement "negotiated between sophisticated business parties as part of an arm's-length negotiation." (FCS MSJ at 38.) Covance and Fisher further argue that the record is "utterly devoid" of evidence suggesting that Defendants acted in bad faith or otherwise engaged in willful or wanton misconduct. (Cov. MSJ at 36; FCS Reply ISO MSJ at 10.)

Techfields responds first that the limitation of liability provisions are unconscionable and violate public policy because the CSA and MCSA are professional services contracts, which are disfavored by courts in New Jersey. (Tech. Opp. to FCS MSJ at 28–29.) Second, Techfields contends that the provisions should not be enforced at this stage based on evidence of, or at least a genuine dispute of material fact as to, Defendants' "intentional, willful[,] and bad faith conduct." (*Id.* at 27–28.)

i.  Professional Services Contracts

Before turning to the bulk of the parties' arguments, the Court briefly addresses Techfields' argument regarding professional services contracts. "The essence of a professional service is one that involves 'specialized knowledge, labor or skill and the labor or skill is predominantly mental or intellectual, rather than physical or manual.'" *Lucier v. Williams*, 841 A.2d 907, 914 (N.J. Super. Ct. App. Div. 2004) (quoting *Burlington Township v. Middle Department Inspection Agency*, 421

A.2d 616, 619 (N.J. Super. 1980)). In general, professionals are "held to the standards of their industry." *Id.* (citing *Erlich*, 505 A.2d at 232–33).

As noted above, Techfields contends that enforcement of the provisions would violate public policy because the CSA and MCSA constitute contracts for professional services, and limitation of liability provisions in professional services contracts are disfavored. (Tech. Opp. to FCS MSJ at 28–29 (citing *Lucier*, 841 A.2d at 914 and *Erlich*, 505 A.2d at 232–33).) Fisher counters that *Lucier* and *Erlich*, the cases cited by Techfields, are not relevant to the facts in the case at bar because those cases involved contracts of adhesion executed by parties with unequal bargaining power. (FCS Reply ISO MSJ at 12–13.)

The Court agrees with Fisher that the cited cases do not involve sophisticated commercial entities with equal bargaining power and are inapposite to the facts in the instant matter. Indeed, the court in *Lucier* explained that the provision at issue, which was part of a home inspection contract, was unconscionable because (1) the contract was "one of adhesion," (2) the parties, "one a consumer and the other a professional expert, have grossly unequal bargaining status," and (3) the damages allowed under the agreement were so nominal that the provision "avoid[ed] almost all responsibility for the professional's negligence." 841 A.2d at 912, 914. Similarly, the court in *Erlich* relied on the unequal bargaining power between the contracting parties—a bank and its client—to find the limitation of liability provision in an investment management contract unenforceable. 505 A.2d at 288.

Moreover, in *66 VMD Associates, LLC v. Melick-Tully and Associates, P.C.*, the Appellate Division rejected the plaintiff's contention that limitation of liability clauses in professional services contracts violate public policy. No. A-4008-09T3, 2011 WL 3503160, at *4 (N.J. Super. Ct. App. Div. Aug. 11, 2011). The Appellate Division explained that the provision at issue in

*Lucier* only violated public policy because the cap on damages was so low that it was "tantamount to an *exculpation* clause." *Id.* (emphasis added) (quoting *Lucier,* 841 A.2d at 914 ("With professional services, exculpation clauses are particularly disfavored.")). An *exculpation* clause differs from a *limitation of liability* clause in that it relieves a party from *any* liability—whereas a limitation of liability clause sets a maximum amount of damages recoverable for a future breach of the agreement. *Id.* at \*5 (citations omitted). The court further explained that the provision at issue in *Erlich*, like the provision in *Lucier*, was also tantamount to an exculpation clause because it provided that the investment manager would not be liable *in any way* for good faith conduct. *Id.* (citations omitted). The Appellate Division therefore concluded that the damages cap in the limitation of liability provision "was not so low as to be the practical equivalent of an exculpation clause," and thus, did not violate public policy, even though it arose in a professional services contract. *Id.*

Here, the limitation of liability provisions in the CSA and MCSA do not attempt to disclaim *all* liability—the provisions simply provide that the damages should be capped at the amount paid out by Techfields to Covance, or by Covance to Fisher, pursuant to their respective agreements. Such a limit does not amount to an exculpation clause. Moreover, as the Court will address further below, the provisions were part of commercial contracts entered into, through arm's length transactions, by parties of equal bargaining power. Therefore, even if the contracts at issue in this case constitute contracts for professional services, the Court finds that they are not unenforceable on that basis. Having determined that the professional services nature of the contracts would not provide a basis for voiding the provisions at issue in this case, the Court now turns to the parties' other arguments.

13

ii. *Gershon* Factors

As noted above, courts in New Jersey generally enforce limitation of liability provisions unless (1) the provision adversely affects the public interest; (2) the exculpated party is under a legal duty to perform;[9] (3) the contract involves a public utility or common carrier; or (4) the contract grows out of unequal bargaining power or is otherwise unconscionable. *Gershon*, 845 A.2d at 727. Courts also consider whether the contract is one of adhesion and the degree of economic compulsion motivating the adhering party. *Doe*, 2018 WL 295565, at *8.

As to the first exception, Techfields contends that enforcing the limitation of liability provisions would undermine "the public's significant interest in safe and effective pharmaceuticals." (Tech. Opp. to FCS MSJ at 29.) Techfields contends that Defendants violated their ethical obligations under the International Council for Harmonization ("ICH") and the Declaration of Helsinki[10] by "repeatedly failing to disclose material concerns and unanticipated interim results to Techfields" and that "[p]ublic policy demands transparency and compliance with all international clinical trial regulations and ethics in order to maintain public safety and confidence in the drug trial process." (*Id.*)

While the seriousness of safety issues associated with carrying out clinical trials for pharmaceutical drugs is axiomatic, Techfields provides no legal authority for its proposition that limitation of liability provisions are unenforceable in the context of clinical trials due to public policy concerns. The case that Techfields cites for the proposition that there is a "significant"

---

[9] This legal duty to perform generally refers to a "statutorily imposed duty" independent of a party's contractual obligations. *See Bartlett v. Push To Walk*, No. 15-7167, 2018 WL 1726262, at *6 (D.N.J. Apr. 10, 2018); *see, e.g.*, *McCarthy v. NASCAR, Inc.*, 226 A.2d 713 (N.J. 1967) (determining that a limitation of liability provision at a car racing event was unenforceable because legislation had been promulgated which was aimed at protecting participants and spectators and a party could not relieve itself of the duty of care owed under such legislation).

[10] The Court notes that Techfields does not explain Defendants' obligations under either the ICH or the Declaration of Helsinki.

14

public interest "in safe and effective pharmaceuticals" has nothing to do with pharmaceutical drugs and stands for a principle contrary to that which Techfields asks the Court to adopt. (Tech. MSJ at 29 (citing *Kearney & Trecker Corp. v. Master Engraving Co.*, 527 A.2d 429 (N.J. 1987).) Indeed, in *Kearney*, the New Jersey Supreme Court *upheld* a contractual provision which forbid consequential damages even where the buyer's limited remedy under the contract "failed to achieve its essential purpose" of making the buyer whole under the Uniform Commercial Code. 527 A.2d at 430. The Court reasoned that "the allocation of risks in accordance with [the parties'] agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement." *Id.* at 437. Moreover, courts tend to invalidate limitation of liability provisions based on public interest concerns only when "the public at large is dependent on the **goods** or services they protect [and] have not done so when the clause is part of a simple commercial transaction between two businesses with the freedom to negotiate." *Morgan Home Fashions, Inc. v. UTI, U.S.*, Inc., No. 03-0772, 2004 WL 1950370, at *6 (D.N.J. Feb. 9, 2004) (citing *Abel Holding Co. v. Am. Dist. Tel. Co.*, 350 A.2d 292, 300 (N.J. Super. Law. Div. 1975), aff'd, 371 A.2d 111 (N.J. Super. App. Div. 1977) (explaining that cases involving the public interest are those where a party is engaged in "performing a service of great importance to the public," often a matter of "practical necessity for some members of the public," and "holds himself out as willing to perform this service for any member of the public who seeks it," such as a contract between a hospital and its patient). Accordingly, the Court does not find the public interest exception in *Gershon* compels invalidation of the limitation of liability provisions in the CSA or MCSA.

As to exceptions two and three, Techfields does not argue, and the Court does not find, that any of the parties are public utilities, common carriers, or under a legal duty to perform. Thus, the

Court turns to the fourth exception: unequal bargaining power and unconscionability. While Techfields contends that the provisions are unconscionable, it does not appear to argue that the CSA or the MCSA are contracts of adhesion or the result of unequal bargaining power. Indeed, the Court finds that Techfields had ample opportunity and ability to negotiate the provisions contained within the contracts.[11] For example, Covance and Techfields apparently engaged in months of negotiations before executing the CSA, which included, prior to entering into contracts with either Defendant, executing a Letter of Intent with Covance and a Letter of Indemnification with Fisher—both of which also contained limitation of liability provisions. (Cov. MSJ at 6; Cov. SOF ¶¶ 17; FCS MSJ at 39–40.) The record contains no evidence that Techfields was in a weaker bargaining position than Covance or Fisher: all three parties are sophisticated and experienced business entities in a position to fully understand the provisions in the CSA and MCSA. *See, e.g.*, *Asch Webhosting, Inc. v. Adelphia Bus. Sols. Inv.*, LLC, 362 F. App'x 310, 312 (3d Cir. 2010) (limitation of liability provision found enforceable with respect to experienced commercial entity).

While Techfields has asserted that Defendants violated their contractual obligations and acted in bad faith in misleading Techfields as to their mistakes, there are no allegations that Defendants fraudulently induced Techfields into entering the CSA or MCSA. *Compare Pro. Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 168 (3d Cir. 2007) (a limitation of liability provision would not be enforceable if a party is deceived into entering the contract by misrepresentation or omissions) *with CDK Glob.*, 489 F. Supp. 3d at 314 (finding limitation of liability provision enforceable when a party enters into a contract "without any fraud or imposition upon him" and no other *Gershon* exceptions apply). However, Techfields

---

[11] Techfields' sophistication is reflected in its skilled and zealous legal representation by its counsel, a national-renowned law firm, in this litigation which has been ongoing for eight years. For example, the docket exceeds three hundred entries, including a myriad of motions filed by Techfields as well as oppositions against multiple dispositive motions, which have been successful.

argues that Defendants' bad faith, willful, wanton conduct nonetheless renders the limitation of liability provisions unenforceable as unconscionable—an argument to which Court now turns.

iii.  <u>Unconscionability and Willful and Wanton Misconduct</u>

As noted above, unconscionability involves a "lack of honesty in fact, good faith, and fair dealing," and, thus limitation of liability provisions cannot disclaim liability for "willful and wanton misconduct." *CDK Glob.*, 489 F. Supp. 3d at 315; *Tessler*, 497 A.2d at 533–34.[12] Techfields contends that enforcement of the CSA and MCSA's limitation of liability provisions would be unconscionable in this case because the provisions cannot "limit damages that flow from intentional torts or bad faith, grossly negligent conduct." (Tech. Opp. to FCS MSJ at 24.) According to Techfields, Fisher acted in bad faith when it chose an inexperienced investigator in Mr. Kovitch to conduct its audit and when, after Mr. Kovitch raised concerns about his report's accuracy, his concerns were ignored by Fisher's senior management, and the audit report was never updated. (*Id.* at 27.) As to Covance, Techfields contends that Covance "conceal[ed] the mix-up" of Active Drug and placebo CTS kits and defended its work on the Clinical Trial while "internally berating itself for 'indefensible' work." (*Id.* at 27.) Defendants counter that the Amended Complaint does not plead tort claims and therefore discussion of intentional torts and gross negligence is irrelevant and misleading. (Cov. Reply ISO MSJ at 13 n. 17, FCS Reply ISO MSJ at 11–12.) Defendants further argue that the record does not reflect bad faith or willful or wanton misconduct. (Cov. MSJ at 36; FCS Reply ISO MSJ at 10.)

---

[12] It is not clear from the case law reviewed by this Court whether willful and wanton misconduct is a *kind* of unconscionability or rather provides a *separate* basis upon which a limitation of liability provision must be voided. This is because, as will be addressed further below, the cases that discuss this standard for unconscionability generally do so in the context of contract formation and are thus considering factors such as adhesion, unequal bargaining power, and economic compulsion. The Court finds it need not decide the issue as it does not affect the Court's conclusion here.

The Court denied summary judgment on Techfields' good faith and fair dealing claims finding genuine disputes of material fact exist as to whether Defendants acted in bad faith by allegedly failing to relay their concerns to Techfields about issues with the Clinical Trial and then covering up their mistakes.[13] As noted above, the Court pointed to the following evidence in the record: (1) there were serious issues with the CTS when it arrived at the Fisher facility, including that Active Drug and placebo kits were "mixed-matched"; (2) the Clinical Trial data reflected that at least some placebo participants may have received the Active Drug; (3) Covance circulated emails reflecting its concerns about the operations at the Fisher facility and its disappointment in its own performance; (4) Mr. Kovitch expressed concerns that his audit report was inaccurate but Fisher never addressed these concerns and the report was never revisited; and (5) Mr. Wang determined that the decomposition of the CTS solutions was so anomalous that someone must have tampered with the CTS. With these pieces of evidence in mind, the Court must now determine whether Techfields' good faith and fair dealing claim encompasses the kind of conduct that renders a limitation of liability provision unenforceable. Having undertaken a careful review of the case law, the Court concludes that it does and that to grant summary judgment for Defendants as to the enforceability of the limitation of liability provisions would be premature.

In *Kugler v. Romain*, the New Jersey Supreme Court defined unconscionability as follows: "[t]he standard of conduct contemplated . . . is good faith, honesty in fact and observance of fair dealing," and therefore unconscionability "must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like." 279 A.2d 640, 652 (N.J. 1971). Citing

---

[13] As noted above, Techfields acknowledges that the limitation of liability provisions in the CSA and MCSA limit its damages for its breach of contract claims. (Tech. Opp to FCS MSJ at 23–24.) In addition, the Court granted summary judgment for Defendants on Techfields' fraud claim. Moreover, Defendants are correct that the Amended Complaint does not otherwise bring tort claims against Defendants. However, Techfields' breach of the implied covenant of good faith and fair dealing claims remain live in this litigation.

*Kugler*, courts in this district have stated that the standard for whether a limitation of liability provision is unconscionable is a "lack of honesty in fact, good faith, and fair dealing." *Doe*, 2018 WL 295565, at *8; *see also CDK Glob.*, 489 F. Supp. 3d at 315 ("The standard for unconscionability is 'lack of honesty in fact, good faith, and fair dealing.'" (quoting *Doe*, 2018 WL 295565, at *8)). Likewise, the New Jersey Appellate Division has stated that the definition of unconscionability as to the enforceability of a limitation of liability provision is "the antithesis to appropriate 'business ethic,' or a lack of 'good faith, honesty in fact, and . . . fair dealing." *66 VMD Assocs.*, 2011 WL 3503160, at *3 (quoting *Kugler*, 279 A.2d 640 at 652). This definition strongly suggests that evidence of a breach of the implied covenant of good faith and fair dealing, as is the case here, would render enforcement of a limitation of liability provision unconscionable.

However, the inquiry is not so simple—the Court recognizes that *Kugler*, *Doe*, *CDK Global*, and *66 VMD* all considered whether a contractual provision was unconscionable *at the time the contract was entered into* and that those are not the circumstances in the case at bar.[14] As noted above, there is no evidence in this record that Techfields was deceived into entering into either the CSA or MCSA. However, the New Jersey Supreme Court's definition of unconscionability is nonetheless highly instructive, and it guides this Court's analysis as to the

---

[14] In *Kugler*, the New Jersey Supreme Court was tasked with interpreting the meaning of unconscionability in Section 203-2 of the Uniform Commercial Code, which states as follows:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable *at the time it was made* the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

279 A.2d at 651; U.C.C. § 2-302 (Am. L. Inst. & Unif. L. Comm'n 1977) (emphasis added). In *Doe*, *CDK Global*, and *66 VMD*, the courts considered unconscionability challenges to the *formation* of contracts based on allegations of adhesion, unequal bargaining power, and economic compulsion. *Doe*, 2018 WL 295565, at *8, *CDK Glob.*, 489 F. Supp. 3d at 315; *66 VMD Assocs.*, 2011 WL 3503160, at *6.

kind of *post-contract-formation* conduct that would render a limitation of liability provision unconscionable.

Indeed, multiple courts in this district have determined that limitation of liability clauses will not limit a party's damages in cases where there is evidence of bad faith *after* the contract was formed. For example, in *Kennedy Funding, Inc. v. Lion's Gate Dev. LLC*, the plaintiff brought claims for breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing. No. 05-4741, 2006 WL 2038496, at *1 (D.N.J. July 19, 2006). The defendant counterclaimed for, *inter alia*, breach of contract, breach of the covenant of good faith and fair dealing, common law fraud, and violation of the New Jersey Consumer Fraud Act. *Id.* The court dismissed defendant's counterclaims for fraud, and thereafter, the plaintiff moved for summary judgment on defendant's remaining counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing, arguing that the defendant's damages must be capped by the limitation of liability provision in the contract. *Id.* at *4. The court rejected the plaintiff's argument, explaining that a "limitation of damages clause will not apply where a party's 'conduct indicates bad faith or some other tortious intent.'" *Id.* (citation omitted). The court concluded: "[The defendant's] counterclaim includes an allegation of bad faith, and whether [the plaintiff's] conduct . . . constituted bad faith is a question for the trier of fact. Therefore, the Court declines to decide at this time whether the limitation of damages clause in the contract may be enforced." *Id.* Likewise, in the case at bar, genuine issues of material fact exist as to the alleged bad faith conduct which forms the basis of Techfields' remaining good faith and fair dealing claims.

Another case, *St. Paul Fire & Marine Ins. Co. v. Wells Fargo Alarm Servs.*, also suggests that a good faith and fair dealing claim would render a limitation of liability clause unenforceable; in *St. Paul*, the court considered "what degree of conduct" would void a limitation of liability

provision. No. 95-712, 1995 WL 306642, at *3 (D.N.J. May 9, 1995). The defendant, relying on *Tessler*, argued that only willful and wanton misconduct would render a limitation of liability clause unenforceable. *Id.* The plaintiff, on the other hand, relying on earlier Appellate Division decisions, argued that a limitation of liability clause also cannot disclaim liability for gross negligence. *Id.* The court determined that the defendant presented the better argument—as noted above, a limitation of liability clause that disclaims liability for negligence can protect a party from claims involving gross negligence but cannot protect a party from claims involving willful and wanton misconduct. *Id.*

What is particularly instructive about *St. Paul* for the case at bar is the court's explanation as to why it chose to adopt the defendant's position. The court wrote: "*Tessler*'s approach is consistent with the implied covenant of good faith and fair dealing under New Jersey law, which prevents a party from undertaking intentional acts that would injure the right of the other to receive the fruits of the agreement. . . . The approach in *Tessler* gives full meaning to the language of the contract and also enforces the notion of the implied covenant of good faith and fair dealing." *Id.* at *5. The explanation provided in *St. Paul* leads this Court to find that the kind of conduct which underpins a good faith and fair dealing claim is consistent with the kind of conduct which would render an otherwise bargained-for limitation of liability provision unenforceable. Put another way, *St. Paul* suggests that violating the implied covenant of good faith and fair dealing constitutes willful and wanton misconduct.

It is further instructive to compare the above cases with *Asch Webhosting, Inc. v. Adelphia Bus. Sols. Inv., LLC*, in which the court enforced a limitation of liability provision contained in the parties' contract. No. 04-2593, 2007 WL 2122044, at *5 (D.N.J. July 23, 2007), aff'd, 362 F. App'x 310 (3d Cir. 2010). The court explained that the plaintiff had failed to demonstrate any

evidence of bad faith on the part of defendant. *Id.* at *4. Therefore "[a]ssuming for purposes of this motion that defendant did breach the [a]greement, plaintiff's vague allegations of hidden motives and changing explanations by defendant for the termination, even if true, do not amount to 'willful and wanton misconduct,' 'gross negligence,' or violate the duty of good faith and fair dealing." *Id.* (quoting *Morgan Home Fashions*, 2004 WL 1950370, at *5; *St. Paul Fire & Marine Ins. Co.*, 1995 WL 306642, at *3). Thus, the court granted summary judgment for the defendant on plaintiff's claims for consequential damages. This is yet another case—and indeed, one that was affirmed by the Third Circuit—in which a court in this district suggested that evidence of a violation of the implied covenant of good faith and fair dealing would render a limitation of liability provision unenforceable.[15] Unlike in *Asch Webhosting*, Techfields presented evidence of bad faith on the part of Defendants, and there remains genuine disputes of material fact as to same.

Finally, as noted above, the Supreme Court of New Jersey has defined willful and wanton misconduct to include a wrongful act or failure to discharge a duty, which is done consciously and intentionally, with knowledge of the existing conditions and that injury will result, and with reckless disregard to the consequences. *McLaughlin*, 266 A.2d at 305. This definition appears consistent with the conduct a plaintiff must prove to make out a good faith and fair dealing claim— which requires a defendant to have acted in bad faith or with a malicious motive to deny the

---

[15] As the Court will discuss further below, Judge Shipp previously determined that Techfields' breach of the implied covenant of good faith and fair dealing claim sounds in contract. (MTD Op. at 12.) At oral argument, Covance argued that if the Court were to find that Techfields' good faith and fair dealing claim sounded in contract, it must also find that the claim is limited by the limitation of liability provisions as a matter of law. Judge Shipp found the argument premature and made "no findings as to the enforceability of the clause or its applicability to the good faith and fair dealing claim." (*Id.* at 12 n.5.) The Court could not find any legal authority which counsels that the principles announced in the cases above do not apply if the good faith and fair dealing claim at issue sounds in contract, rather than in tort. Thus, Judge Shipp's determination that the claim sounds in contract does not affect this Court's conclusion that summary judgment on the enforceability of the limitation of liability provisions as to Techfields' good faith and fair dealing claims is premature. However, as will be addressed further below, the Court does find Judge Shipp's determination important for this Court's consideration of punitive damages in this case.

plaintiff its contractual benefits in violation of community standards of decency, fairness, and reasonableness. *Yapak, LLC v. Mass. Bay Ins. Co.*, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009); *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007) (internal citations omitted). This definition also appears consistent with the conduct Techfields alleges in the case at bar: that Defendants concealed errors that occurred during the course of the Clinical Trial, failed to run down concerns about the accuracy of the post-Trial audits, and tampered with the CTS to cover up their mistakes.

As the Court noted in its first summary judgment Opinion, there are numerous bases upon which a reasonable jury could challenge Techfields' version of the facts. However, it is not the Court's role at this stage to weigh the evidence. Although it was a close call, there was enough evidence in the record for Techfields to withstand summary judgment on its good faith and fair dealing claim—whether Defendants acted in bad faith in this case is now a question for the trier of fact. Accordingly, the Court cannot find at this stage that the limitation of liability provisions in the CSA and MCSA limit Techfields' damages that flow from its claims for breach of the implied covenant of good faith and fair dealing.

### b. PUNITIVE DAMAGES

Having determined that Techfields' damages are not necessarily constrained as a matter of law by the limitation of liability provisions, the Court next considers Fisher's argument regarding Techfields' claim for punitive damages. Fisher contends that Techfields' punitive damages demand is founded upon speculation and "defies the well-established rule that punitive damages are not appropriate for breaches of contract." (FCS MSJ at 36.) According to Fisher, Techfields' breach of the implied covenant of good faith and fair dealing sounds in contract, and thus, the "interrelationship" between Techfields' breach of contract claims and good faith and fair dealing

claims prevents Techfields from recovering for punitive damages. (*Id.* at 37.) Techfields counters that the motion is (1) premature because the Court bifurcated punitive damages discovery and (2) deficient because the record is "laden with evidence of willful and wanton [mis]conduct." (Tech. Opp. to FCS MSJ at 22.)

At the outset, the Court will address Techfields' contention that a decision on punitive damages is premature. Techfields is correct that on June 19, 2020, the Honorable Lois H. Goodman, former U.S.M.J., bifurcated punitive damages discovery. She ordered: "[d]iscovery related to Techfields'[] claim for punitive damages is bifurcated and shall be addressed by the parties following the disposition of motions for summary judgment to the extent necessary and upon a request to the Court for same." (ECF No. 172.) The Court does not interpret Judge Goodman's order to prevent a determination at the summary judgment stage as to whether Techfields is legally entitled to punitive damages on its remaining claims. Her order appears to contemplate that summary judgment might obviate the need for punitive damages discovery. Moreover, as the Court noted in its first summary judgment Opinion, discovery in this case was voluminous—since April 2018, discovery has included the production of more than 1.2 million pages, over twenty (20) fact depositions, and ten (10) proffered experts, all of which resulted in a robust record. The Court finds additional discovery would not aid its determination as to punitive damages and thus turns to the parties' arguments.

"Where the essence of a cause of action is limited to a breach of . . . contract, punitive damages are not appropriate regardless of the nature of the conduct constituting the breach." *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 358 A.2d 805, 812 (N.J. Super. Ct. App. Div. 1976), *holding modified by Ellmex Const. Co. v. Republic Ins. Co.*, 494 A.2d 339 (N.J. Super. Ct. App. Div. 1985). "[G]enerally punitive damages are inappropriate in breach of contract causes of

action 'even where the breach is malicious and unjustified.'" *Furey v. Leonard Buck Tr.*, No. A-2242-20, 2022 WL 2838831, at *19 (N.J. Super. Ct. App. Div. July 21, 2022), *cert. denied*, 289 A.3d 812 (N.J. 2023) (quoting *Sandler*, 358 A.2d at 812). However, there are exceptions to that general principle "where the unusual relationship between the parties reflects a breach of trust beyond the mere breach of a commercial contract." *Id.* (quoting *Sandler*, 358 A.2d at 812). For example, punitive damages may be available in contractual litigation involving a fiduciary relationship. *Sandler*, 358 A.2d at 812.

The Court finds that Techfields is not entitled to punitive damages in this case. As noted above, after hearing oral argument on this issue, Judge Shipp, in a thoughtful and thorough opinion, determined that Techfields' good faith and fair dealing claim sounds in contract. (MTD Op. at 12.) Judge Shipp reasoned that "[r]egardless of whether a contract term is expressly included by the parties or implied by law, it is still a term of the contract [and] [a]s such, it logically follows that the breach of an implied covenant amounts to a breach of the contract in which it was implied." (*Id.* at 12–13.)

Based on Judge Shipp's determination that Techfields' good faith and fair dealing claim sounds in contract, the Court finds that the "essence" of this case is a breach of contract case. Thus, even assuming Defendants' conduct is as malicious as Techfields alleges, punitive damages are not appropriate unless the parties have some sort of special relationship. Nothing in the record suggests the existence of such relationship: the parties in this case are commercial entities operating through arm's length business dealings. Punitive damages are not warranted in such cases.[16] Accordingly, the Court finds punitive damages inappropriate, and will grant Fisher's Motion as to punitive damages.

---

[16] The Court notes that the Appellate Division has stated in dicta that a plaintiff may "be permitted to pursue punitive damages" on a breach of the covenant of good faith and fair dealing claim in "an exceptional and

### c.  LOST PROFITS

Finally, the Court turns to Defendants' arguments that Techfields' claim for lost profits is impermissibly speculative. Covance, arguing that Techfields' demand is "incurably speculative," points to its contemporaneously filed *Daubert* Motion to Exclude the Report, Testimony, and Opinion of Baresciano, who "presents a 'conceptual framework' for lost profits ranging from $14.3 million to $2.2 billion for Techfields, a company that has never sold a product." (Cov. MSJ at 39.) Covance argues that Mr. Baresciano's report "is nothing if not speculative, and it is fundamentally inconsistent with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rules 702 and 703 of the Federal Rules of Evidence." (*Id.* at 39 n.27.) Similarly, Fisher argues that Techfields' alleged damages range of $14.3 million to $2.2 billion is speculative on its face. (FCS MSJ at 17.) Moreover, Fisher contends that Techfields' assumption that X0002 is likely to be approved by the FDA for commercialization is fraught with uncertainties and that Mr. Baresciano failed to substantiate his damages analysis with any reliable data, "resulting in highly speculative—and therefore legally inadequate—damages." (*Id.* at 18, 20.) Covance further argues that Techfields is barred from recovering lost profits as a matter of law under New Jersey's New

---

particularly egregious case." *Taddei v. State Farm Indem. Co.*, 951 A.2d 1041, 1049 (N.J. Super. Ct. App. Div. 2008). This statement does not affect the Court's conclusion that punitive damages are not warranted in this action. First, *Taddei* arose in the context of an insured pursuing a claim against her insurance carrier, and the Appellate Division's statement appears limited to that context. *Id.* ("The existence of the [judgment] rule should not bar *an aggrieved insured* from pursuing a meritorious claim *against the insurer* for breach of the covenant of good faith and fair dealing, and the ability to recover all consequential damages, and, in an exceptional and particularly egregious case, even be permitted to pursue punitive damages." (emphasis added)). Indeed, courts in New Jersey have determined that the relationship between an insurer and an insured involves a "special duty . . . of good faith and fair dealing." *Sandler*, 358 A.2d at 812 (citations omitted). No special relationship exists in this case. Second, as noted above, the record in this case lacks overwhelming evidence of bad faith, and the Court found it a close call to deny summary judgment on Techfields' good faith and fair dealing claim, which counsels against finding this to be a "exceptional and particularly egregious case" for which punitive damages are warranted. *Taddei*, 951 A.2d at 1049.

Business Rule, which according to Covance, bars new businesses from recovering lost profits damages. (Cov. MSJ at 38.) The Court will begin with Covance's New Business Rule argument.

i. New Business Rule

In New Jersey, "lost profits may be recoverable if they can be established with a reasonable degree of certainty," but "anticipated profits that are remote, uncertain or speculative are not recoverable." *Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 21 A.3d 1151, 1158 (N.J. 2011) (cleaned up). Based on this principle, courts in New Jersey have held that new businesses may not recover lost profits because such profits are too speculative or remote to meet the reasonable certainty standard. *See, e.g.*, *Bell Atl. Network Servs., Inc. v. P.M. Video Corp.*, 730 A.2d 406, 419 (N.J. Super. Ct. App. Div. 1999); *Juice Ent., LLC v. Live Nation Ent., Inc.*, 353 F. Supp. 3d 309, 311–13 (D.N.J. 2018) ("[r]ecently New Jersey courts undoubtedly follow[] the new business rule").

Covance argues that Techfields constitutes a new business, "having never commercialized a drug, made a profit, or sold X0002 (or any other product) in the marketplace," and thus damages based on future profits from the potential sale of X0002 are wholly barred by the New Business Rule. (Cov. MSJ at 39.) Techfields responds, *inter alia*, that the Supreme Court of New Jersey recently granted certification on this issue and will likely formally reverse the New Business Rule. (Tech. Resp. to Cov. MSJ at 27 (citing *Schwartz v. Menas*, 249 A.3d 186, 187 (N.J. 2021) (granting petition for certification))).

Shortly after the parties submitted their briefing on their Motions for Summary Judgment, the Supreme Court of New Jersey indeed issued a decision in *Schwartz v. Menas*. 279 A.3d 436 (N.J. 2022). In this case, a consolidated appeal arising from two actions, the defendants argued that the new business rule "imposes a per se ban on a new business's claims for lost profits on the

27

ground that no such claim can be proven with reasonable certainty." *Id.* at 438. The trial court deemed the businesses at issue in both cases to constitute new businesses, barred the testimony of the plaintiffs' damages experts, and granted summary judgment for the defendants. *Id.* The Appellate Division affirmed. *Id.* However, in *Shwartz*, the Supreme Court reversed and remanded, holding: "we concur with the majority of courts that reject a per se rule barring any new business's claim for lost profits damages, and decline to follow the new business rule." *Id.* at 447–48. The Court "reiterated the general rule that under New Jersey law, lost profits may be recoverable if they can be established with a reasonable degree of certainty" and that "anticipated profits that are remote, uncertain or speculative" are not recoverable. *Id.* at 447. In addition, the Supreme Court acknowledged that it is "substantially more difficult for a new business to establish lost profits damages with reasonable certainty than it is for an established business to do so." *Id.* at 438. However, the Court tasked trial courts with "undertak[ing] a fact-sensitive analysis of the evidence offered by a new business when it determines a motion to bar such a claim." *Id.*

In light of the New Jersey Supreme Court's holding in *Schwartz*, even presuming Techfields constitutes a new business, there is no per se bar to its recovery for lost profits. The question the Court must answer is simply whether Techfields—new business or not—can establish lost profits with a reasonable degree of certainty. Beyond the contention that Techfields is a new business that has never secured regulatory approval for its products, Defendants' arguments that Techfields' lost profits cannot be established with the requisite certainty hinge on their challenges to Mr. Baresciano. Thus, the Court now turns to Defendants' *Daubert* Motions.

### ii. *Daubert* Challenges to Mr. Baresciano

As noted above, Defendants filed two *Daubert* Motions, which remain pending before the Court, that contend that Mr. Baresciano's framework for calculating lost profits damages is

unreliable and his conclusions impermissibly speculative. (*See* ECF Nos. 205, 209.)[17] The Court

must determine whether to take up Defendants' motions at this time or following a *Daubert*

hearing. Both Defendants request oral argument on their motions, (ECF Nos. 205 at *1, 209 at *1),

but neither address whether the Court should hold a *Daubert* hearing before ruling. Nor does

Techfields address the need for a hearing in its briefs in opposition. (ECF Nos. 243, 246.)

The Third Circuit has "long stressed the importance of in limine hearings under Rule 104(a)

in making the reliability determination required under Rule 702 and *Daubert*." *Padillas v. Stork-*

*Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999). In *Padillas*, the Third Circuit explained that the

need for a "detailed factual record" is particularly important "when summary judgment may

result." *Id.* (citation omitted). That the nonmoving party did not request a *Daubert* hearing "is

immaterial," especially in light of the fact that "the burden of establishing admissibility by a

preponderance of the evidence . . . is on the proponent" of the expert. *Id.* at 417–18. The *Padillas*

Court noted that a hearing is not always required whenever a *Daubert* objection is raised, but when

a *Daubert* challenge concerns "the factual dimensions of the expert evidence," and "when the

ruling on admissibility turns on factual issues . . . at least in the summary judgment context, failure

to hold such a hearing may be an abuse of discretion." *Id.* at 418. For this proposition, the Court

cited *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, which provides guidance

on what kind of "factual dimensions" would require the Court to hold a hearing. *Id.* (citing 998

F.2d 1224, 1240 (3d Cir. 1993)). In *Petruzzi's IGA Supermarkets*, the Third Circuit reviewed a

decision by the district court to exclude expert testimony on the basis that the data used by the

expert was "unreliable." 998 F.2d at 1240. The Third Circuit concluded that the district court

---

[17] Covance filed a brief in support of its "Daubert Motion of Covance Inc. to Exclude Report, Opinions, and Testimony of Jeffrey B. Baresciano," (*see* ECF No. 206), which Fisher joined, (*see* ECF No. 211).

abused its discretion by excluding the proffered testimony, stating: "if the court were concerned about the accuracy of the data, then it should have held an in limine hearing to assess the admissibility of the testimony." *Id.* In short, the Third Circuit has counseled that a court should hold a hearing when a *Daubert* challenge is based on the reliability and accuracy of the data upon which the challenged expert relies. *Id.*

Here, Defendants argue that Baresciano "failed to substantiate his damages analysis with *any* reliable data." (FCS MSJ at 20 (emphasis in original).) They repeatedly argue that Baresciano's assumptions and estimates are "unreliable." (*See generally* ECF No. 206 ("Cov. Daubert").) Thus, in ruling on Defendants' Motions, the Court must consider the accuracy of the data upon which Baresciano relied to formulate his expert opinion. In light of the Third Circuit's guidance, the Court will hold a *Daubert* hearing to assess the admissibility of Mr. Baresciano's expert report, opinions, and testimony. The Court will issue an Order setting this matter for a hearing, at which time the Court will revisit Defendants' arguments that lost profits are not recoverable in this case because they cannot be established with the requisite degree of certainty.

<u>**CONCLUSION**</u>

For the foregoing reasons, Fisher's Motion for Summary Judgment is **DENIED** as to the enforceability of the limitation of liability provision in the MCSA and **GRANTED** as to Techfields' claim for punitive damages. Covance's Motion for Summary Judgment is **DENIED** as to the enforceability of the limitation of liability provision in the CSA and as to the application of the New Business Rule. The Court **RESERVES RULING** on Defendants' arguments that Techfields' claim for damages based on lost profits is impermissibly speculative until after the Court makes a ruling on the admissibility of Mr. Baresciano's expert report, opinions, and testimony. The Court will schedule a hearing on Defendants' *Daubert* Motions.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

<u>Dated</u>: May 14, 2024